Nos. 2013-1665, -1666, -1667

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ADJUSTACAM, LLC,
                                        *Plaintiff-Appellant,*

v.

NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.,
                                        *Defendants-Cross Appellants,*

and

SAKAR INTERNATIONAL, INC.,
                                        *Defendant-Cross Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS IN CASE NO. 10-CV-329
THE HONORABLE CHIEF JUDGE LEONARD DAVIS

**BRIEF FOR *AMICI CURIAE* GARMIN INTERNATIONAL, INC.,
KASPERSKY LAB, LIMELIGHT NETWORKS, INC., SAP
AMERICA, INC., SAS INSTITUTE INC., AND XILINX, INC. IN
SUPPORT OF CROSS APPELLANTS NEWEGG INC.,
NEWEGG.COM, INC., & ROSEWILL, INC.**

STEVEN D. MOORE
**KILPATRICK TOWNSEND &
STOCKTON LLP**
Eighth Floor, Two Embarcadero Center
San Francisco, CA  94111
Telephone:  415 576 0200

*Attorneys for AMICI CURIAE*

October 1, 2014

**Form 9**

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____ v. _____

No. _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

_____

_____

_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____

_____

_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____

_____

_____

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

_____

_____

_____          _____
          Date                          Signature of counsel

                                _____
                                  Printed name of counsel

Please Note: All questions must be answered

cc: _____

# <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ............................................................1

SOURCE OF AUTHORITY TO FILE ...................................................1

ARGUMENT ........................................................................................2

    **I.**    SOME NON-PRACTICING ENTITIES ARE
EXPLOITING THE PATENT SYSTEM FOR
FINANCIAL GAIN, DRAWING CRITICISM
FROM COMMENTATORS AND COURTS ...............................2

    **II.**   FEE SHIFTING PROTECTS LITIGANTS FROM
ABUSIVE TACTICS AND DISINCENTIVIZES
THE FILING AND MAINTENANCE OF
MERITLESS LAWSUITS ................................................................5

        **A.**    Awarding attorneys' fees in appropriate
cases is essential to restoring balance to the
patent system and deterring the filing of
future meritless suits. ............................................................5

        **B.**    Expert fee shifting discourages the
unreasonable maintenance of lawsuits and
compensates parties injured by these
practices. ..............................................................................9

    **III.**  THE RELIEF REQUESTED BY NEWEGG IS
APPROPRIATE .........................................................................13

CONCLUSION ...................................................................................14

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
    393 F.3d 1378 (Fed. Cir. 2005) ...........................................................................5

*Chambers v. NASCO, Inc.*,
    501 U.S. 32, 111 S. Ct. 2123 (1991).......................................................9, 10, 11

*Eltech Sys. Corp. v. PPG Indus., Inc.*,
    903 F.2d 805 (Fed. Cir. 1990) ...........................................................................10

*Eon-Net LP v. Flagstar Bancorp*,
    653 F.3d 1314 (Fed. Cir. 2011) ...............................................................3, 4, 11

*Kilopass Tech. Inc. v. Sidense Corp.*,
    10-cv-020566 SI (N.D. Cal. Aug. 12, 2014) ........................................................7

*Lumen View Tech. LLC v. Findthebest.com Inc.*,
    13 CIV. 3599 DLC, 2014 WL 2440867 (S.D.N.Y. May 30, 2014) .....................7

*MarcTec, LLC v. Johnson & Johnson*,
    664 F.3d 907 (Fed. Cir. 2012) .........................................................................4, 9

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014)................................................................................5, 6, 7

*Parallel Iron LLC v. NetApp Inc.*,
    No 12-769-RGA (D. Del. Sept. 12, 2014)............................................................7

*Raylon, LLC v. Complus Data Innovations, Inc.*,
    700 F.3d 1361 (Fed. Cir. 2012) .........................................................................13

*Summit Data Systems, LLC v. EMC Corporation et al.*,
    No. 1:10-cv-00749, slip op. (D. Del. Sept. 25, 2014)..........................................7

*Summit Data Systems LLC v. EMC Corporation*,
    No. 1:10-cv-00749 (D. Del. Sept. 25, 2014) ........................................................7

# TABLE OF AUTHORITIES
### (continued)

Page

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
549 F.3d 1381 (Fed. Cir. 2008) ....................................................................9, 11

## Other Authorities

*2013 NPE Litigation Report*, RPX CORPORATION, 2014, at 4, 31-32 .......................2

*Acacia Research's CEO Discusses Q4 2013 Results – Earnings Call
Transcript*, SEEKING ALPHA (Feb. 21, 2014, 12:16 PM),
http://seekingalpha.com/article/2039043-acacia-researchs-ceo-
discusses-q4-2013-results-earnings-call-transcript ..............................................8

*Acacia Research's Matthew Vella on Q2 2014 Results – Earnings
Call Transcript*, SEEKING ALPHA (Jul. 25, 2014, 12:56 AM),
http://seekingalpha.com/article/2342005-acacia-researchs-actg-
matthew-vella-on-q2-2014-results-earnings-call-transcript .................................8

AM. INTELLECTUAL PROP. LAW ASS'N LAW PRACTICE
MGMT. COMM., REPORT OF THE ECONOMIC SURVEY 35,
I-145-I-152 (2013) ...............................................................................................4

Barack Obama, United States President, Fireside Hangout on Google+
(Feb. 14, 2013), http://www.youtube.com/watch?v=kp_zigxMS-Y ...................3

David Segal, *Has Patent, Will Sue: An Alert to Corporate America*,
N.Y. Times (July 13, 2013) .................................................................................3

Eric Savitz, *Are Patent Trolls Now Zeroed In On Start-Ups?*, Forbes
(Jan. 17, 2013, 6:24 PM),
http://www.forbes.com/sites/ciocentral/2013/01/17/are-patent-
trolls-now-zeroed-in-on-start-ups/ ......................................................................2

FED. R. APP. P. 29(c) .............................................................................................1

FED. R. CIV. P. § 285...........................................................................................5, 13

FED. R. CIV. P. 11 .................................................................................................13

# TABLE OF AUTHORITIES
### (continued)

<u>Page</u>

Joe Mullin, *New study suggests patent trolls really are killing startups*, Ars Technica (June 11, 2014, 8:55 PM), http://arstechnica.com/tech-policy/2014/06/new-study-suggests-patent-trolls-really-are-killing-startups/.................................................2

Owen Byrd & Brian Howard, *2013 Patent Litigation Year in Review* LEX MACHINA, 2014, at 1 .................................................2

Randall R. Rader, Colleen Chien & David Hricik, *Make Patent Trolls Pay in Court*, N.Y. Times (June 4, 2013).................................................3

Timothy B. Lee, *Here's what it feels like to be sued by a patent troll*, The Washington Post (July 18, 2013), http://www.washingtonpost.com/blogs/wonkblog/wp/2013/07/18/heres-what-it-feels-like-to-be-sued-by-a-patent-troll/ .................................................2

WHITE HOUSE (June 4, 2013), http://www.whitehouse.gov/the-press-office/2013/06/04/fact-sheet-white-house-task-force-high-tech-patent-issues.................................................3

*Amici curiae* Garmin International, Inc., Kaspersky Lab, Limelight Networks, Inc., SAP America, Inc., SAS Institute Inc., and Xilinx, Inc. (collectively "*Amici*") respectfully submit this brief in support of Defendants-Cross Appellants Newegg Inc., Newegg.com, Inc., & Rosewill, Inc. (collectively "Newegg") and in support of Newegg's request for reversal of the District Court's denial of an exceptional case finding and an award of fees.

## INTEREST OF *AMICI CURIAE*[1]

*Amici* have all been subjected to meritless patent suits and have been burdened by the high-cost of defending against such litigation. *Amici* regularly face settlement demands in these meritless cases and the dilemma of either paying the high cost of defense or paying less to settle. *Amici* thus have a substantial interest in the use of fee shifting to encourage plaintiffs to file only meritorious suits.

## SOURCE OF AUTHORITY TO FILE

*Amici* have attached this brief to a motion for leave of the Court to file as *amici*.

---

[1] Pursuant to Fed. R. App. P. 29(c), Garmin International, Inc., Kaspersky Lab, Limelight Networks, Inc., SAP America, Inc., SAS Institute Inc., and Xilinx, Inc. state: 1) no party's counsel authored this brief in whole or in part; 2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and 3) only Symmetry LLC contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

I.    **SOME NON-PRACTICING ENTITIES ARE EXPLOITING THE PATENT SYSTEM FOR FINANCIAL GAIN, DRAWING CRITICISM FROM COMMENTATORS AND COURTS**

Non-practicing entities ("NPEs") are filing an ever-increasing number of suits. Patentees filed 6092 suits in 2013, a 12.4% increase from the year prior. Owen Byrd & Brian Howard, *2013 Patent Litigation Year in Review*, Lex Machina, 2014, at 1, *available at* https://lexmachina.com/2014/05/patent-litigation-review/. NPEs filed many of these and account for the top ten plaintiffs by suits filed. *Id.* at *i*, 8. Of all NPEs over the last five years, Acacia, who wholly owns Adjustacam, filed the most cases and sued the most defendants. *2013 NPE Litigation Report*, RPX Corporation, 2014, at 4, 31-32, *available at* http://www.rpxcorp.com/wp-content/uploads/2014/01/RPX-2013-NPE-Litigation-Report.pdf.

Some NPEs engage in abusive litigation practices that have drawn the attention of commentators, government officials, and the public.[2] President

---

[2] For several examples see Timothy B. Lee, *Here's what it feels like to be sued by a patent troll*, The Washington Post (July 18, 2013), http://www.washingtonpost.com/blogs/wonkblog/wp/2013/07/18/heres-what-it-feels-like-to-be-sued-by-a-patent-troll/; Joe Mullin, *New study suggests patent trolls really are killing startups*, Ars Technica (June 11, 2014, 8:55 PM), http://arstechnica.com/tech-policy/2014/06/new-study-suggests-patent-trolls-really-are-killing-startups/; Eric Savitz, *Are Patent Trolls Now Zeroed In On Start-Ups?*, Forbes (Jan. 17, 2013, 6:24 PM), http://www.forbes.com/sites/ciocentral/2013/01/17/are-patent-trolls-now-zeroed-

Obama, for example, has spoken out against such practices. Barack Obama, United States President, Fireside Hangout on Google+ (Feb. 14, 2013), http://www.youtube.com/watch?v=kp_zigxMS-Y ("They're just trying to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them.").[3] Former Chief Judge Rader has also discussed these problems at length. *See, e.g.*, Randall R. Rader, Colleen Chien & David Hricik, *Make Patent Trolls Pay in Court*, N.Y. Times (June 4, 2013), http://www.nytimes.com/2013/06/05/opinion/make-patent-trolls-pay-in-court.html.

NPEs enjoy certain strategic advantages throughout litigation, which some NPEs exploit against defendants to force nuisance value settlements. NPEs face little risk throughout litigation. They are "immune to counterclaims for patent infringement, antitrust, or unfair competition." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011). They also face little in the way of discovery costs, unlike the targets of their suits. *Id*. And even when a case

---

in-on-start-ups/; David Segal, *Has Patent, Will Sue: An Alert to Corporate America*, N.Y. Times (July 13, 2013), http://www.nytimes.com/2013/07/14/business/has-patent-will-sue-an-alert-to-corporate-america.html.

[3] The White House has gone on to formalize these remarks and recommend more discretion in fee shifting. *See FACT SHEET: White House Task Force on High-Tech Patent Issues*, the WHITE HOUSE (June 4, 2013), http://www.whitehouse.gov/the-press-office/2013/06/04/fact-sheet-white-house-task-force-high-tech-patent-issues.

proceeds long enough to invalidate a patent, an NPE is not badly harmed because its "patents protect[]only settlement receipts, not [] products." *Id*. at 1328. Consequently, NPEs exploiting these advantages have little to lose:

> With huge advantages in cost and risk, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success. When they lose a case, after all, they are typically out little more than their own court-filing fees. Defendants, on the other hand, have much more to lose from a protracted legal fight and so they often end up settling.

Rader, *supra*. Some NPEs choose to leverage these advantages and the high cost of defense to force defendants into settling for nuisance values. *See Eon-Net LP*, 653 F.3d at 1327-28.

Attorneys' and expert fees can be significant and are therefore easily leveraged for settlement. Even in NPE cases where less than $1,000,000 is at risk, the median cost of litigation is $300,000 through the end of discovery and $600,000 total. AM. INTELLECTUAL PROP. LAW ASS'N LAW PRACTICE MGMT. COMM., REPORT OF THE ECONOMIC SURVEY 35, I-145-I-152 (2013). These values more than double with any additional risk to $750,000 and $1,250,000 respectively at the low end and $2,500,000 and $4,000,000 respectively at the high end. Expert fees are also substantial. *See, e.g.*, *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 910 (Fed. Cir. 2012) (affirming an award of expert fees for $809,788.02). NPEs, on the other hand, face substantially lower, shared costs or use contingency fee arrangements.

- 4 -

These asymmetries and questionable litigation practices have dramatically altered patent litigation and strained defendant corporations and the resources of the judiciary. However, courts are increasingly rebalancing litigation risks through fee awards under *Octane*.

## II.    FEE SHIFTING PROTECTS LITIGANTS FROM ABUSIVE TACTICS AND DISINCENTIVIZES THE FILING AND MAINTENANCE OF MERITLESS LAWSUITS

### A.    Awarding attorneys' fees in appropriate cases is essential to restoring balance to the patent system and deterring the filing of future meritless suits.

A meaningful fee-shifting framework should discourage the filing of meritless suits. The *Brooks Furniture* test proved to be "overly rigid" in requiring subjective bad faith and objectively baseless litigation. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1754, 1756 (2014) (citing *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)). As such, behavior qualifying under § 285 was often independently sanctionable. *See id*. at 1756 ("[T]he first category of cases . . . appears to extend largely to independently sanctionable conduct.). *Brooks Furniture* also allowed NPEs to engage in abusive litigation conduct without fear of any consequences, as long as that behavior was not so egregious to be independently sanctionable. These realities shifted the economic burden of litigation onto defendants and created strong economic incentives for NPEs to file meritless suits and otherwise

engage in litigation practices that fell well outside the norm. But the abusive

tactics that had become standard operating procedure for abusive NPEs cannot

continue under *Octane*.

In the wake of *Octane*, fee shifting can rebalance the risks of patent

litigation to disincentivize the filing of meritless suits. In deciding *Octane*, the

Supreme Court recognized the pitfalls of a rigid test and relaxed the standard to

account for instances, such as this one, where conduct falls well outside litigation

norms but may not otherwise be independently sanctionable. To that end, "an

'exceptional' case is simply one that stands out from others with respect to the

substantive strength of a party's litigating position (considering both the

governing law and the facts of the case) or the unreasonable manner in which the

case was litigated." *Id*. at 1749. Perhaps most importantly, the Court emphasized

the need to consider compensation and deterrence in awarding fees. *Id*. at 1756

n.6.

Suits where plaintiffs engage in the kind of exploitative behavior described

above are exceptional cases under *Octane*. Not only do these NPE cases escape

the generally self-enforcing norms of patent litigation (e.g., relatively equal costs

on each side of a competitor suit), but the plaintiffs in them have taken

affirmative steps to undermine the operation of the patent system. Such behavior

therefore warrants judicial intervention. District courts have begun to apply

*Octane* or their inherent powers to award fees in this manner, and the facts of this case are sufficient to warrant an award of fees under this new standard as well. *See, e.g.*, *Summit Data Systems LLC v. EMC Corporation*, No. 1:10-cv-00749 (D. Del. Sept. 25, 2014); *Chalumeau Power Systems LLC v. Alcatel-Lucent*, No. 11-1175-RGA (D. Del. Sept. 12, 2014); *Parallel Iron LLC v. NetApp Inc.*, No 12-769-RGA (D. Del. Sept. 12, 2014); *Kilopass Tech. Inc. v. Sidense Corp.*, 10-cv-020566 SI (N.D. Cal. Aug. 12, 2014); *Lumen View Tech. LLC v. Findthebest.com Inc.*, 13 CIV. 3599 DLC, 2014 WL 2440867 (S.D.N.Y. May 30, 2014).

In *Summit Data Systems*, the court found another Acacia entity responsible for fees after it initiated a "reckless and wasteful litigation" campaign seeking nuisance settlements and extensively delaying its ultimate concession and dismissal of its objectively unreasonable case. *Summit Data Systems, LLC v. EMC Corporation et al.,* No. 1:10-cv-00749, slip op. at 8 (D. Del. Sept. 25, 2014). Unfortunately, Acacia's pattern of leveraging the asymmetric burdens of litigation to extract settlements—in *Summit Data Systems* and here—is no coincidence. Some NPEs have learned very well how to game the system, but most do not admit that. Acacia, on the other hand, publicly attributes its ability to collect revenue to this business model.

As a publicly traded company, Acacia periodically reports to its investors on its performance. In earnings calls following its required disclosures, Acacia

regularly boasts that it uses late-stage litigation dates—trial dates in particular—as key leverage to drive revenue to extract settlements, or as Acacia calls them, "revenue events." *Acacia Research's Matthew Vella on Q2 2014 Results – Earnings Call Transcript*, SEEKING ALPHA (Jul. 25, 2014, 12:56 AM), http://seekingalpha.com/article/2342005-acacia-researchs-actg-matthew-vella-on-q2-2014-results-earnings-call-transcript (attributing quarterly performance to "the association of revenues with trial dates" and "the operational leverage of our business model."; acknowledging that "trial dates are historically correlated to revenue events"); *Acacia Research's CEO Discusses Q4 2013 Results – Earnings Call Transcript*, SEEKING ALPHA (Feb. 21, 2014, 12:16 PM), http://seekingalpha.com/article/2039043-acacia-researchs-ceo-discusses-q4-2013-results-earnings-call-transcript (explaining that "trial dates . . . are historically correlated to revenue events" and that noting the "connection between these upcoming dates and the altered cadence and tenure of our negotiations of prospective licensees"; observing "an increasing number of trial dates driving negotiation deadlines"; describing "the correlation between trial dates and revenue events" and noting "the correlation materializes in the weeks and months prior to the trial dates"). To Acacia, patent litigations are not disputes to be resolved reasonably on the merits but commodities used to create leverage and in turn, predictable revenue streams to satisfy investors. Acacia's systematic

exploitation of the legal process to generate "revenue events" without regard for the merits of its cases should be strongly discouraged.

## B. Expert fee shifting discourages the unreasonable maintenance of lawsuits and compensates parties injured by these practices.

Promulgated rules and statutes do not adequately define the contours of permissible litigation conduct. Courts have long used their inherent powers to protect litigants from abusive conduct and to ensure the integrity of the judicial system. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46, 111 S. Ct. 2123, 2132-33 (1991). While these inherent powers vary greatly, expert fee shifting is perhaps the most important in the context of modern patent litigation.

Courts have consistently awarded fees when a party engages in bad faith litigation that abuses the judicial process. The Supreme Court has upheld the use of fee shifting in cases exhibiting bad faith under a court's inherent authority to "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-46, 111 S. Ct. at 2133. This Court has similarly awarded expert fees in cases of bad faith. *See MarcTec*, 664 F.3d at 921-22; *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (explaining that it is unnecessary to show fraud).

Bad faith sufficient to warrant an award of expert fees may manifest itself in a variety of ways. First, in *Chambers*, the Supreme Court discussed the need to prevent abuse of the judicial process. 501 U.S. at 44-46, 111 S. Ct. at 2133.

Conduct that reveals a systematic plan to exploit the judicial process and leverage the high cost of defense to force defendants into nuisance value settlements therefore demonstrates sufficient bad faith. Such behavior includes filing suit against numerous defendants in an effort to quickly settle for nuisance values, as was the case here. In these cases, the plaintiffs never intend to use the judicial process for any legitimate purpose, and so courts should proscribe such uses.

Second, "where . . . the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith . . . ." *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990); *Chambers*, 501 U.S. at 46, 111 S. Ct. at 2133 (commenting on showing bad faith by delaying). Claim construction, especially, may objectively nullify an infringement position and warrants a careful review.

Third, the timing of any dismissal may reveal a party's motivations. Dismissal on the eve of the first legitimate risk and cost a plaintiff faces (e.g., summary judgment, as is often the case in certain NPE litigation) may suggest bad faith, especially where this timing "happens" to leave a defendant especially harmed. Specifically, infringement positions may become untenable after claim construction, and yet they are unlikely to suddenly evaporate on the verge of summary judgment. Instead, one may infer a plaintiff is hoping to leverage costs for a settlement up to the moment he has to incur any real risk. In such cases, as

here, it is difficult to imagine any other reason for a plaintiff to have walked away from suit on the eve of summary judgment.

In conjunction with bad faith, an award of expert fees is appropriate in the absence of another suitable remedy. The Supreme Court justified the use of inherent power "where the conduct at issue is not covered by one of the other sanctioning provisions." *Chambers*, 501 U.S. at 50, 111 S. Ct. at 2135; *accord Takeda*, 549 F.3d at 1391 ("[C]ourts may use sanctions in cases involving bad faith that cannot be otherwise reached by rules or statutes."). No other sanction or statute grants relief in expert fee shifting cases. Attorneys' fees are insufficient, as they fail to properly compensate litigants who were forced to expend large sums on experts. Further, even if an award of attorneys' fees became likely during the course of litigation (e.g., after claim construction), a plaintiff would still have an incentive to maintain its lawsuit in order to leverage the high cost of experts for a final chance at extracting a settlement. Only if those expert fees were also recoverable in such cases would a plaintiff be financially deterred.

NPEs that file suit in bad faith to seek nuisance value settlements are encouraged to maintain lawsuits because the asymmetric, strategic advantages discussed above persist until, at least, a decision on the merits.[4] This is true even

---

[4] Even a ruling of invalidity is less severe for NPEs. *See Eon-Net*, 653 F.3d at 1328 ("[The NPE] did not face any business risk resulting from the loss of patent protection over a product or process. Its patents protected only settlement

after an unfavorable claim construction ruling forecloses any reasonable infringement theories, as occurred here, because defendants disproportionately bear the cost of discovery and expert fees. Expert fees can be as costly as attorneys' fees during various phases of a litigation. Here, for example, Adjustacam's expert forced Newegg to spend over $68,000 on expert fees to defend itself. Such sums are more than sufficient to allow these select NPEs to maintain their leverage over defendants, especially when they are seeking nuisance value settlements.

Expert fee shifting is thus essential to compensate defendants and to deter the unreasonable maintenance of lawsuits. In such bad faith cases, litigation without the possibility of expert fee shifting incentivizes "bad" behavior, as discussed, and disincentivizes "good" behavior. In the latter case, specifically, it is important to encourage defendants to resist baseless and exploitative litigation. This is especially true when this widely recognized problem can only be discouraged through an award of fees, which requires litigants to defend until the end of the litigation.

Finally, it is manifestly unjust to condone a system of justice wherein non-infringing defendants are economically forced into settlements. This is especially true when the judicial system is the tool used to extract these settlements. Yet

receipts, not its own products.").

defendants seeking to minimize economic risk, regardless of the absurdity of any infringement positions, will be forced to choose settlement over the high cost of expert fees if there is little chance of recovery.

Without such disincentives, patentees are economically encouraged to abuse the judicial process to extort money from patent defendants at the cost of innovation. Fee shifting can generally be used to compensate defendants and to deter such conduct. However, to fully compensate for these asymmetries and their resulting injustices, and to discourage the unreasonable maintenance of lawsuits, the use of fee shifting must extend to expert fee shifting in cases such as this one.

## III.    THE RELIEF REQUESTED BY NEWEGG IS APPROPRIATE

The absurdity of Acacia's infringement claim here mirrors that in *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012) ("Raylon's claim construction of 'display pivotally mounted on said housing' is a prime example of a construction that falls below [the reasonableness] threshold."). In *Raylon*, a pre-*Octane* case, the Federal Circuit made this determination (in a Rule 11 context) on its own. Post-*Octane*, the Federal Circuit can likewise find Acacia's positions to be objectively unreasonable in the context of section 285, and remand for as little further adjudication as possible; this case has continued long enough.

## **CONCLUSION**

For the foregoing reasons, *amici* respectfully submit that the judgment of the district court be reversed.

DATED:  October 1, 2014          Respectfully submitted,

KILPATRICK TOWNSEND &
STOCKTON LLP


By:  */s/ Steven D. Moore*
     STEVEN D. MOORE

*Attorneys for AMICI CURIAE*

**Form 19**

FORM 19.   Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [            *2,977*            ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using [            *Microsoft Word 2010*            ] in [            *Times New Roman, 14 point font*            ], or

☐    The brief has been prepared in a monospaced typeface using [                                        ] with [ [                                        ].

/s/ Steven D. Moore
_____
(Signature of Attorney)

Steve D. Moore
_____
(Name of Attorney)

Amici Curiae
_____
(State whether representing appellant, appellee, etc.)

October 1, 2014
_____
(Date)

Reset Fields

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on by:
October 1, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Steven D. Moore

/s/ Steven D. Moore

Name of Counsel

Signature of Counsel

Law Firm   Kilpatrick Townsend & Stockton LLP

Address   Two Embarcadero Center, Eighth Floor

City, State, ZIP   San Francisco, CA  94111

Telephone Number   (415) 576-0200

FAX Number   (415) 576-0300

E-mail Address   smoore@kilpatricktownsend.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.